UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, ) <br> United States Department of Labor,[1] ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> PANTHER CITY HAULING, INC., ) <br> PERRY RIDGE LANDFILL, INC., & ) <br> JOSEPH MAZZA, an individual ) <br> ) <br> **Defendants.** ) | <br> <br> <br> <br> <br> CIVIL No. 3:13-CV-337-MJR-DGW <br> <br> <br> <br> CJRA TRACK: B <br> TRIAL: July 14, 2014 <br> JUDGE: Michael J. Reagan |

**SECRETARY'S BRIEF IN SUPPORT OF HIS MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**INTRODUCTION**

Plaintiff, the Secretary of Labor, U.S. Department of Labor ("Secretary"), submits this brief in support of his Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment. The Secretary is entitled to summary judgment because Defendants terminated the Complainant, Mark Gates ("Complainant" or "Gates"), on July 27, 2011, in violation of Section 11(c) of the Occupational Safety and Health Act of 1970 ("the Act" or "the OSH Act"), 29 U.S.C. § 660(c)(1).  Each Defendant is a "person" under the Act and is jointly and severably liable for violations of Section 11(c).  Defendants have not presented and cannot present a legitimate, non-discriminatory, and non-pretextual reason for Complainant's termination. Moreover, Defendants cannot establish that, in the absence of Complainant's protected activity, Complainant would have been terminated. For the reasons set forth below, summary judgment is appropriate.

---

[1] By operation of law, Thomas E. Perez is substituted for former Acting Secretary of Labor, Seth D. Harris. Fed. R. Civ. P. 25(d).

## STATEMENT OF RELEVANT FACTS

**I.  Perry Ridge Landfill and Joseph Mazza**

Perry Ridge operates a landfill in Du Quoin, Illinois. (PR Resp. to Interrog. No. 3, p. 2.[2]) Its corporate headquarters are located in Carol Stream, Illinois. (*Id.*)  As of July 27, 2011, Perry Ridge's directors were Patrick Mazza ("P. Mazza") and Stephanie Chodera.[3] (*Id.* at 5.)  Its officers were P. Mazza (Non-Executive Chairman), Chodera (Vice President and Secretary), Joseph Mazza ("J. Mazza") (Vice President), Mike Whitlock (Operations Manager), Tom Emling (Area Manager), and Karen Schatz (Finance and Accounting Manager). (*Id.*)  J. Mazza and P. Mazza are brothers and both work in Carol Stream. (J. Mazza Dep. 24:23-25:1, 30:8-15, 37:16-38:3.[4]) In July 2011, Perry Ridge had approximately 12-15 employees, approximately 10 of whom worked at the landfill. (Emling Dep. 97:12-16;[5] J. Mazza Dep. 39:17-22, 40:10-13.)

**II.  Panther City Hauling**

Panther City was formed on December 23, 2008, after the company was purchased from its prior owner. (PR Resp. to Interrog. No. 8, p. 5; Emling Dep. 31:1-32:5.)  Although Emling became the sole shareholder, he borrowed $25,000 through P. Mazza for a down payment on the company; in exchange, Emling executed a stock transfer giving P. Mazza the ability to cancel Emling's stock at any time. (Emling Dep. 34:14-16, 44:4-14, 61:2-4, 222:2-16, 256:19-22.) Thus, Emling only considered himself to be a "figurehead local owner" of Panther City. (Emling

---

[2]  Responses and Objections to Plaintiff's First Set of Interrogatories to Defendant Perry Ridge Landfill, Inc., attached hereto as Exhibit A.
[3]  Unless otherwise noted, all references to individuals will be made by last name, except for P. Mazza and J. Mazza.
[4]  A true and accurate copy of all relevant portions of the Deposition of Joseph Mazza is attached hereto as Exhibit B.
[5]  A true and accurate copy of all relevant portions of the Deposition of Thomas Emling is attached hereto as Exhibit C.

Dep. 220:18-221:5; Mullins Decl., ¶7(a).[6]) As of July 27, 2011, Panther City's directors were Emling, P. Mazza, J. Mazza, and Chodera. (PR Resp. to Interrog. No. 8, p. 6.) Its officers were Emling (President), J. Mazza (Vice President), Chodera (Secretary), and Schatz (Treasurer). (*Id.* at 5-6; J. Mazza Admiss., No. 1.[7]) During July of 2011, Emling was President of Panther City and Area Manager of Perry Ridge. (Emling Dep. 38:10-15.) Emling also worked at two other entities for the Mazzas: Buckner Sand and Marion Ridge Landfill. (*Id.* 25:22-26:15, 67:5-21.)

### III. The Business Relationship Between Perry Ridge and Panther City

As part of its business, Panther City performed certain hauling services for Perry Ridge. (J. Mazza Dep. 61:10-13; Emling Dep. 29:2-15.) Panther City also dumped the municipal waste it collected at Perry Ridge for a discounted rate. (PR Resp. to Interrog. No. 9, p. 6; Emling Dep. 37:8-18, 38:16-20, 45:13-16.) But, as of July 27, 2011, Panther City had never paid Perry Ridge for its municipal waste disposal, and as of December 2011, owed Perry Ridge $487,647.00. (Emling Dep. 42:12, 43:12, 47:8-11.) Perry Ridge also never paid Panther City for the hauling services Panther City performed. (*Id.* at 127:16-23; Dec. 2011 Releases, p. 1.[8]) In addition to the aforementioned unreimbursed services, Panther City also shared payroll services with Perry Ridge (via Panther City/Perry Ridge officers who worked in Perry Ridge's Carol Stream office), received funding for equipment from Perry Ridge, and repaired Perry Ridge property without charge. (Emling Dep. 70:1-71:13, 86:12-87:15, 122:19-123:7.) At all times relevant to this matter, Emling routinely spoke to J. Mazza once or twice per week, and to P. Mazza every day. (*Id.* at 25:12-13, 30:9-12.)

---

[6] Declaration of Sean Mullins, dated 03/06/14, attached hereto as Exhibit D.
[7] Responses and Objections to Plaintiff's First Set of Requests for Admissions to Defendant Joseph Mazza, Docket No. 23, filed November 15, 2013.
[8] Releases dated Dec. 2011, Bates-stamped PCH085-PCH088, attached hereto as Exhibit E.

Toward the end of 2011, P. Mazza decided to close or sell Panther City. (*Id.* at 44:2-23.) Emling decided he wanted to own the business outright, so the parties entered into a financing agreement. (*Id.* at 60:14-61:1.) In exchange for Panther City exclusively dumping its municipal waste at Perry Ridge, Perry Ridge agreed to forgive Panther City's debt over a period of ten years, beginning in December 2011. (*Id.* at 47:12-15; 12/27/11 Agreement, p. 1-2, 11.[9]) Also in December 2011, J. Mazza (as Vice President for Panther City and Perry Ridge) executed releases for amounts due between the two companies. (Dec. 2011 Releases, p. 1, 3.) P. Mazza, J. Mazza, Schatz, and Chodera resigned their positions as officers and directors of Panther City effective December 31, 2011. (Resignations, p. 1[10]; PR Resp. to Interrog. No. 8, p. 6.) As of February 27, 2013, Panther City still owed Perry Ridge $438,882.89. (02/27/13 Agreement, p. 1-2, 16.[11])

## IV. Complainant Mark Gates & Leachate Disposal

Gates was hired by Emling in November 2010 as a semi-truck driver to perform hauling services for Panther City. (Emling Dep. 107:1-21; Gates Dep. 60:2-4.[12]) Gates was responsible for hauling items (such as rocks, sawdust, and sand) to Perry Ridge, and hauling leachate (fluid that seeps from the landfill into a system of pipes) from Perry Ridge to the City of Du Quoin's treatment facility. (Emling Dep. 57:7-22; J. Mazza Dep. 107:21-108:7.) Normally, Gates clocked in to work at Panther City, then reported to Perry Ridge to perform his duties. (Gates Dep. 35:16-23; 36:2-10.) Gates received work instructions from Emling and Perry Ridge's General Manager, Mike Whitlock. (*Id.* at 35:6-12, 36:5-16; Emling Dep. 81:21-82:6, 84:3-7.)

As of July 2011, Gates was the **only** person who hauled leachate for Perry Ridge.

---

[9] Agreement dated Dec. 27, 2011, Bates-stamped GHG 000182-GHG 000192, attached hereto as Exhibit F.
[10] Resignations dated Dec. 31, 2011, Bates-stamped PCH046, attached hereto as Exhibit G.
[11] Agreement dated Feb. 27, 2013, Bates-stamped GHG 000193-GHG 000208, attached hereto as Exhibit H.
[12] A true and accurate copy of all relevant portions of the Deposition of Mark Gates, is attached hereto as Exhibit I.

4

(Emling Dep. 57:23-58:5; J. Mazza Dep. 109:23-110:12, 144:17-19; Gates Dep. 429:2-5.) When the leachate needed to be disposed of, Gates would drive to Perry Ridge, transfer the leachate from Perry Ridge's tanks to the truck's trailer, drive the leachate to the treatment facility, and return with the empty trailer to Perry Ridge. (Emling Dep. 93:14-22; Gates Dep. 66:1-17.) All of the equipment used to perform the leachate hauling job, including the tanks, truck, trailer, and hose, were owned by Perry Ridge. (Emling Dep. 57:8-22; 84:17-19; J. Mazza Dep. 109:12-110:20.) Gates typically hauled four loads per day. (Emling Dep. 93:14-24; Gates Dep. 66:18-23.) This job required Gates to climb a ladder to the top of the leachate trailer and connect a hose from the tanks to the trailer. (Gates Dep. 427:21-428:9.) On at least two occasions, Gates came close to falling off the leachate trailer, which can become slick when the leachate water overflows. (*Id.* at 131:13-16; 340:16-22).

### V. Complainant's Fall Protection Complaints

On three or four occasions during the months prior to his termination, Gates complained to Whitlock about the lack of sufficient fall protection provided for him when he worked on top of the trailer as part of his leachate-hauling duties. (*Id.* at 150:15-151:5; 431:1-6.) The first time Gates complained, Whitlock provided Gates with a safety harness. (*Id.* at 154:1-7.) Gates told Whitlock that he thought he also needed a tie-off overhead to which he could hook the safety harness, but Whitlock told him to hook it to the ladder. (*Id.* at 155:1-22.) Prior to ordering this safety harness, Whitlock consulted with J. Mazza. (J. Mazza Dep. 47:20-48:24.) Gates made two to three other complaints to Whitlock about the same issue, but Whitlock said they did not have time or money to install a tie-off. (Gates Dep. 431:7-16.) Approximately a month before his termination, Gates also took his complaint about fall protection to Emling. (Mullins Decl., ¶6(c);

Emling Dep. 210:13-21; Gates Dep. 153:8-13.) Emling and Gates researched the OSHA regulations together, and Emling deferred to Perry Ridge's solution of providing a safety harness. (Emling Dep. 119:1-23; 210:24-211:4.) Gates did not believe the safety harness was sufficient because it was too long to prevent a fall without a tie-off; therefore, he did not wear it. (Gates Dep. 424:22-23, 427:19-428:23.)

## VI. July 25-27, 2011, Events

On July 23, 2011, Gates drove a scooter to work and filled it with gas at Perry Ridge. (Gates Dep. 62:8-63:4; Emling Dep. 138:7-11.) The following day, someone wrote "no scooters" on the gas can. (Gates Dep. 73:13-18.) On July 25, Gates asked Whitlock if he had written on the gas can, and Whitlock stated no and directed Gates to the shop where two other employees were located. (*Id.* at 86:10-19.) Emling was also present and followed Gates into the shop. (Emling Dep. 139:20-23.) Gates asked the employees if one of them had put the note on the gas can and, when one of the employees confessed, Gates stated he would "whoop his ass" if he ever did it again. (Gates Dep. 96:1-8; Emling Dep. 139:24-140:16.) At some point during the incident, Whitlock got in Gates' face and told him to leave. (Gates Dep. 98:14-19; Emling Dep. 140:17-23.) Gates and Whitlock exchanged words until Emling stepped in to defuse the situation, after which Gates left the shop to haul leachate. (Gates Dep. 100:10-17; Emling Dep. 145:2-16.)

After the incident, Whitlock and J. Mazza spoke on the phone at 9:25 a.m. (PR/J. Mazza Amend. Resp. to Interrog. No. 2, p. 2[13]; J. Mazza Dep. 187:23-188:1, 196:22-24, 205:23-206:3;

---

[13] Amended Responses to Plaintiff's First Set of Interrogatories to Defendants Perry Ridge Landfill, Inc. and Joseph Mazza, attached hereto as Exhibit J.

J. Mazza Cell Ph. Rec., p. 1[14]; Whitlock Cell Ph. Rec., p. 1.[15]) J. Mazza admits that it is "very likely" that Whitlock told him about the incident involving Gates during that phone call. (J. Mazza Dep. 198:9-16; PR/J. Mazza Amend. Resp. to Interrog. No. 11, p. 3-4.) Whitlock also informed J. Mazza that Gates was the driver that worked for Panther City and hauled Perry Ridge's leachate. (J. Mazza Dep. 137:23-138:8.) J. Mazza claims that he told Whitlock that Gates needed to be fired and that he forbade Gates from coming back on Perry Ridge property. (*Id.* at 132:7-19; 139:13-15.) J. Mazza claims he attempted to contact Emling on July 25 to recommend Gates' termination, but phone records reveal that no such call was placed on that date. (*Id.* at 17:15-17; 31:14-32:21, 127:4-15, 129:20-130:10, 161:10-162:22; J. Mazza Cell Ph. Rec., p. 1; J. Mazza Office Ph. Rec., p. 1[16]; Emling Dep. 19:8-10, 30:13-20; Emling Ph. Rec., p. 1-2.[17]) No disciplinary action was taken against Gates on July 25 or 26, 2011. (PCH Admiss., Nos. 21, 22.[18])

Gates worked as scheduled on July 26, 2011, hauling leachate from and working on Perry Ridge property. (Gates Dep. 130:4-15; Emling Dep. 152:1-12.) Whitlock signed a Uniform Hazardous Waste Manifest (required to haul leachate to the treatment facility) for Gates to haul leachate on July 26, demonstrating that Whitlock was aware Gates was on Perry Ridge property that day, despite J. Mazza's alleged prohibition. (Manifest, p. 1.[19]) At approximately 8:00 a.m., Gates contacted OSHA to file a complaint relating to the lack of fall protection provided when he

---

[14] J. Mazza Cell Phone Records for (630) 986-7690, Bates-stamped GHG 000209, GHG 000169, GHG 000210, attached hereto as Exhibit K.
[15] Whitlock Cell Phone Records for (618) 319-0532, Bates-stamped GHG 000165-GHG 000166, attached hereto as Exhibit L.
[16] J. Mazza Office Phone Records for (630) 588-0993, Bates-stamped GHG 000164, attached hereto as Exhibit M.
[17] Emling Phone Records for (618) 525-0155, Bates-stamped PCH089-PCH090, attached hereto as Exhibit N.
[18] Defendant Panther City Hauling, Inc.'s Answers to Plaintiff's First Set of Requests for Admissions, Docket No. 22, filed November 14, 2013.
[19] Uniform Hazardous Waste Manifest, Bates-stamped GHG 000352, attached hereto as Exhibit O.

was on top of the tank to transfer the leachate. (Fuchs Decl., ¶3.[20]) That morning, while attempting to transfer the leachate, Gates had slipped on top of the trailer. (Gates Dep. 131:11-18.) Gates spoke to Frank A. Fuchs, Compliance Safety and Health Officer for OSHA. (Fuchs Decl., ¶¶1, 3.) At approximately 9:05 a.m., Fuchs left messages for Perry Ridge and Panther City. (Fuchs Decl., ¶¶4, 6.) He did not receive a response from Panther City on July 26. (Fuchs Decl., ¶6.) Instead, he sent a letter to Panther City on July 27. (Fuchs Decl. ¶7.)

Fuchs did receive a response from Perry Ridge. (Fuchs Decl., ¶5.) According to phone records, Whitlock called OSHA at 1:40 p.m. on July 26. (PR Ph. Rec., p. 1;[21] J. Mazza Dep. 34:1-35:8.) At that time, Fuchs informed Whitlock of the substance of the complaint and Whitlock told Fuchs that he knew who made the complaint and stated that he had provided the employee with fall protection. (Fuchs Decl., ¶5; Mullins Decl., ¶9(a).) At 1:58 p.m., less than twenty minutes after speaking to OSHA, Whitlock called J. Mazza at his office and the two spoke for 4.8 minutes. (PR Ph. Rec., p. 1; J. Mazza Office Ph. Rec., p. 1; J. Mazza Dep. 204:24-205:22.) J. Mazza stated that Whitlock contacted him in the early afternoon about the July 25, 2011, OSHA complaint, and he admits that it is possible he and Whitlock discussed the OSHA complaint during the 1:58 p.m. call. (J. Mazza Dep. 51:1-16; 205:10-12; 209:17-210:2.) When Whitlock told J. Mazza about the OSHA complaint on July 26, he informed J. Mazza that Gates had made the complaint. (Mullins Decl., ¶9(b).) J. Mazza testified that Whitlock may have told him on July 26 that it was Gates who filed the OSHA complaint, and J. Mazza knew on the afternoon of July 26 that the OSHA complaint was related to a safety harness, that a safety harness had been given to the driver of the leachate trailer, and that **only** Gates drove a truck for Panther City and hauled Perry Ridge's leachate. (J. Mazza Dep. 143:6-9, 144:7-145:24, 137:23-

---

[20] Declaration of Frank A. Fuchs, dated 03/04/14, attached hereto as Exhibit P.
[21] Perry Ridge Phone Records for (618) 357-5599, Bates-stamped GHG 000168, attached hereto as Exhibit Q.

138:8; *see also* Mullins Decl., ¶8.)

At 2:13 p.m. – less than fifteen minutes after speaking to Whitlock – J. Mazza called Emling's cell phone. (J. Mazza Dep. 192:7-22; J. Mazza Cell Ph. Rec., p. 2; Emling Ph. Rec., p. 2.) During that conversation, J. Mazza directed Emling to terminate Gates, citing Gates' verbal threats to Perry Ridge employees. (Emling Dep. 154:15-24; Mullins Decl., ¶¶5(a), 6(a); PCH Admiss., Nos. 15, 26.) J. Mazza told Emling that the termination was not open for discussion and Emling admits that he did not say much during the conversation and that he viewed J. Mazza's statement as an instruction, not a recommendation. (Mullins Decl., ¶6(a); Emling Dep. 216:9-24; 155:8-15; 158:15-23.) J. Mazza called Emling again at 2:24 p.m. to tell him to document his basis for Gates' termination and to have a witness present. (J. Mazza Cell Ph. Rec., p. 2; Emling Ph. Rec., p. 2; Emling Dep. 156:6-13.) Emling states that the reason he terminated Gates is because J. Mazza told him to, and that he viewed J. Mazza as his superior. (Emling Dep. 134:8-12, 137:11-14.) Emling believed that J. Mazza, as a director of Panther City, had authority to fire employees. (Emling Dep. 246:2-16; PCH Admiss. No. 13.)

Because Gates had already clocked out for the day on July 26, Emling was not able to terminate Gates until the morning of July 27, 2011. (Emling Dep. 159:2-6; PCH Admiss., No. 3.) After Emling told Gates he was fired, Gates stated that he "expected that" because he had filed the OSHA complaint the day before. (Emling Dep. 170:14-18.) Emling stated that he felt Gates was terminated for calling OSHA and "probably admitted" to Gates that he could see why Gates thought he was fired for filing the OSHA complaint because of the timing. (Mullins Decl., ¶5(b); Emling Dep. 171:19-172:9.) After terminating Gates, Emling called J. Mazza to check in with him about Gates' termination. (Emling Dep. 172:21-173:7.)

Emling and Whitlock, who were both present for the incident on July 25, 2011, have both

9

stated that they would not have terminated Gates for his behavior. (Emling Dep. 184:24-185:4; Mullins Decl., ¶¶6(c), 6(b), 9(c).) Emling would have given Gates a written warning. (Emling Dep. 214:18-215:4.) Emling terminated other employees prior to Gates, including an employee who was drinking on the job, but in each case Emling gave the employee a verbal and/or written warning first. (Emling Dep. 182:14-183:4, 187:1-188:5, 198:14-199:20, 200:4-16.) J. Mazza also terminated an employee who was on drugs, admittedly a danger to the safety of others, but even that employee was first given a warning before termination. (J. Mazza Dep. 155:5-156:7.) J. Mazza and Emling both testified that they have not dealt with employee OSHA complaints other than Gates' complaint. (Emling Dep. 11:4-18; J. Mazza Dep. 26:18-27:15.) Emling also stated that he considered bringing Gates back to work for Panther City, but he would need to find a way to minimize contact between Gates and Perry Ridge because the landfill did not want Gates in their trucks or at the landfill. (Mullins Decl., ¶7(b); Emling Dep. 223:20-224:22.)

**STANDARD**

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**ARGUMENT**

To establish retaliation under Section 11(c), the Secretary must prove that: (1) the complainant engaged in protected activity; (2) the defendants had knowledge of the

complainant's protected activity; (3) the complainant suffered an adverse employment action; and (4) a causal connection exists between the adverse action and the protected activity. *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir. 1994); *accord Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013) (discussing the "direct method" of establishing retaliation); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006). "If the evidence [under the direct method of proof] is uncontradicted, the plaintiff is entitled to summary judgment." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Here, the Secretary has established all four elements of a retaliation case under Section 11(c) and furthermore has established that Defendants' proferred reason for Gates' termination is pretext. Therefore, the Secretary is entitled to judgment as a matter of law.

I.      **Defendants are "Persons" Under the Act and are Jointly & Severally Liable**

Section 11(c) of the Act provides that "[n]o *person* shall discharge or in any manner discriminate against any employee because such employee has filed any complaint" related to the Act. 29 U.S.C. § 660(c)(1) (emphasis added). The term "person" means "one or more individuals, partnerships, associations, corporations, business trusts, legal representatives, or any organized group of persons." 29 U.S.C. § 652(4). The "person" need not be a complainant's employer; Section 11(c) may be violated by anyone in a position to discriminate against an individual who engages in protected activity. *Donovan v. Diplomat Envelope Corp.*, 587 F.Supp 1417, 1425 (E.D.N.Y. 1984) ("[I]t is clear that the defendant in an action under 29 U.S.C. Section 660(c) need not be an employer."); *Reich v. State Credit, Inc.*, 897 F.Supp 1014, 1016 (N.D. Ohio 1995) (a manager is not excused from liability under the Act because the "statute's prohibition extends to any person in a position to discriminate") (quotations omitted).

Irrespective of which company or individual was Gates' putative employer, each Defendant in this matter clearly meets the definition of a "person" under the Act. Therefore, each Defendant is jointly and severally liable for violations of Section 11(c).

### II.  Complainant Engaged in Protected Activity & Suffered an Adverse Action

The Act protects employee complaints made to federal, state, and local agencies, 29 C.F.R. § 1977.9(b), as well as complaints to employers, if made in good faith, 26 C.F.R. § 1977.9(c). Gates engaged in protected activity when he complained to Panther City and Perry Ridge about the lack of fall protection on the leachate tank and when he filed a complaint with OSHA about the same safety concerns on July 26, 2011. *See* 29 CFR § 1977.9(c); *Marshall v. Springville Poultry Farm*, 445 F. Supp. 2 (M.D. Pa. 1977); *Donovan*, 587 F. Supp. at 1425; *Donovan v. Peter Zimmer Am., Inc.*, 557 F. Supp. 642, 651 (D. S.C. 1982). It is undisputed that Gates was subject to an adverse action when he was terminated on July 27, 2011.

### III.  Defendants Knew of or Suspected Complainant's Protected Activity

As noted above, to establish a retaliation case under Section 11(c), the Secretary must show that the Defendants had knowledge or suspicion of Gates' protected activity. *Hoy Shoe*, 32 F.3d at 367. Knowledge can be established by admission or documentary evidence, among other things, or can be inferred from conditions existing at the workplace. It is not necessary to prove actual knowledge; it is sufficient to show that the Defendants suspected that Gates had engaged in protected activity. *See Reich v. Cambridgeport Air Sys.*, 26 F.3d 1187, 1189 n.1 (1st Cir. 1994). Here, Defendants had actual knowledge of Gates' complaints regarding the lack of fall protection on the leachate tank, and furthermore suspected that Gates had filed the July 26

OSHA complaint. Upon being notified of the July 26 OSHA complaint, Whitlock told Fuchs that he knew who made the complaint and explained that he had provided the complaining employee with fall protection. Furthermore, during his phone call with J. Mazza on the afternoon of July 26, Whitlock informed J. Mazza that Gates had made the complaint. Indeed, because Gates is the only employee at the landfill who hauls leachate, he was the only employee who *could have* complained to OSHA about the lack of fall protection on the leachate tank. Where there are a limited number of employees, a court may assume that management knew the identity of an anonymous whistleblower. *Bill Johnson's Rest. v. NLRB*, 660 F.2d 1335 (9th Cir. 1981). Given that only one employee could possibly have complained about the lack of fall protection at the landfill, such an assumption is appropriate in this case.

### IV. A Causal Connection Exists Between Complainant's Protected Activity & Adverse Action

Under the "direct method" of establishing retaliation, a plaintiff may present direct evidence of retaliation or a "convincing mosaic" of evidence. *Hobgood*, 731 F.3d at 643. The Seventh Circuit recognizes three general categories of circumstantial evidence available to complainants using the "convincing mosaic" approach. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). These include: (1) suspicious timing, ambiguous statements, and other "bits and pieces" from which one could draw a retaliatory inference; (2) evidence that an employer has offered a pretextual reason for the adverse employment action; and (3) evidence that similarly situated employees were treated differently. *Id.*; *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Coleman*, 667 F.3d at 835 (quoting *Troupe v. May Dep't Stores Co.*, 20

13

F.3d 734, 737 (7th Cir. 1994)). The Secretary demonstrates convincing evidence in all three categories.

### A.    *Suspicious Timing*

The proximity in time between when Defendants knew or suspected Gates of filing the OSHA complaint and Gates' termination establishes a strong inference of a causal connection between Gates' protected activity and his discharge. *See, e.g., Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987). Whether an adverse employment action falls close on the heels of protected activity "depends on context," *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (internal citation omitted), but "the closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). "For an inference of causation to be drawn *solely* on the basis of a suspicious-timing argument, [courts] typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell*, 679 F.3d at 966.

Here, less than 15 minutes elapsed between when Defendants Perry Ridge and J. Mazza learned about the OSHA complaint (which they knew or suspected had been filed by Gates) and when J. Mazza called Emling to instruct him to terminate Gates' employment. The temporal proximity between Defendants' knowledge or suspicion of Gates' protected activity and the Defendants' subsequent decision to terminate him is compelling evidence that Gates' discharge was retaliation for filing the July 26 OSHA complaint. *See*, *e.g.*, *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (holding that a one-day period between an employee's complaint and her supervisor's recommendation to fire her was sufficient to establish a causal link).

### B. Pretext

Defendants' stated reason for Gates' termination – that he made a verbal threat to Perry Ridge employees on July 25, 2011 – is pretextual. All record evidence supports a strong inference of retaliation. *Coleman*, 667 F.3d at 861. The pretext inquiry focuses on whether a proffered reason for an adverse action was honest. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d. 712, 727 (7th Cir. 2005). Thus, "evidence that calls truthfulness into question" is probative. *Id.* (quoting *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995)).

In this case, the uncontroverted evidence regarding the events of July 25 and 26 belies the truthfulness of Defendants' stated reason for Gates' termination. On the morning of July 25, J. Mazza spoke with Whitlock about the incident that occurred at the landfill between Gates and Perry Ridge employees. J. Mazza asserts that he told Whitlock during this July 25 call that Gates was no longer allowed on Perry Ridge property. In addition, J. Mazza has repeatedly claimed throughout this litigation that, after speaking with Whitlock, J. Mazza attempted to call Emling on July 25 to instruct Emling to terminate Gates. Not only are these two claims unsupported by the record, but the record actually disproves J. Mazza's assertions.

First, by all accounts, Gates continued to work as usual on Perry Ridge property on July 26, despite the prohibition that J. Mazza allegedly communicated to Whitlock. Whitlock himself signed off on a manifest that was necessary for Gates to perform his work on July 26. Thus, Whitlock was undoubtedly aware that Gates was on Perry Ridge property that day, the inference being that Whitlock and J. Mazza never discussed Gates' termination nor keeping Gates off the property. In addition, the phone records conclusively establish that J. Mazza never made any attempt to contact Emling on July 25. In fact, the phone records show that J. Mazza did not contact Emling until after he became aware of Gates' OSHA complaint.

In addition to these obvious contradictions, J. Mazza failed to contact (or even attempt to contact) Emling until the afternoon of July 26. If J. Mazza so strongly believed that Gates' behavior warranted termination and that Gates should be banned immediately from Perry Ridge property because he posed a danger to others, one would expect J. Mazza to at least attempt to contact Emling before a day and a half had lapsed since J. Mazza first learned of the incident.

Whitlock and Emling's statements provide another basis for determining that the proffered reason for Gates' termination is pretext. Both Whitlock and Emling were present for the incident on July 25, and both stated that they did not believe Gates' conduct warranted termination. Emling stated that he would have given Gates a verbal or written warning. Thus, the severity of Gates' behavior on July 25 appears to have been blown out of proportion by Defendants in order to provide a non-discriminatory reason for his termination. Finally, Emling testified that he follows a progressive disciplinary program when disciplining his employees. In Gates' case, however, Emling terminated Gates without any verbal or written warning, in contravention of his own policy. "[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin*, 420 F.3d at 727.

The following uncontroverted evidence, set forth above, demonstrates that the July 25 incident was not the real reason for Gates' termination: (1) J. Mazza states that he attempted to call Emling on July 25, but his phone records demonstrate that he actually waited a day and a half after finding out about the July 25 incident to take any action (and only then after he knew about the OSHA complaint); (2) Whitlock allowed Gates to continue his regular work activities on Perry Ridge property on July 26; (3) both Emling and Whitlock admit that the July 25 incident did not warrant termination; and (4) Emling failed to follow his own disciplinary policy with respect to Gates. Accordingly, an inference of retaliatory intent should be drawn from

16

Defendants' pretextual reason for Gates' termination. *Hobgood*, 731 F.3d at 644.

        C.     *Defendants Disciplined Similarly Situated Employees Differently Than Gates*

Finally, the record evidence proves that Defendants treated Gates differently than other employees in regard to disciplinary action. Prior to Gates' termination, Emling had never terminated an employee without first giving the employee a verbal and/or written warning. This included a heavy equipment operator who was drinking on the job and clearly posed a danger to himself and others. Similarly, J. Mazza terminated an employee who was on drugs while at work, but only after first giving the employee "one more chance," and despite his admission that the employee was a danger to the safety of others. (J. Mazza Dep. 155:14.)  Both Emling and J. Mazza stated that they have not handled OSHA complaints other than the one filed by Gates. Accordingly, unlike Gates, the employees who received warnings prior to their terminations had not engaged in protected activity by filing an OSHA complaint. The fact that Gates was treated differently than similarly situated employees who had not engaged in protected activity is evidence of a causal connection between Gates' protected activity and his termination. *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of [unlawful] intent.")

Putting all of the aforementioned into context and considering all of the facts as a whole, *Hobgood*, 731 F.3d at 644, the Secretary has established through a "convincing mosaic" of circumstantial evidence that a causal link exists between Gates' protected activity and his termination. Accordingly, the Secretary has met his burden under the direct method of establishing retaliation under Section 11(c).

17

## V.  Absent His Protected Activity, Complainant Would Not Have Been Terminated

The Supreme Court has held that, when considering a Title VII retaliation claim, the plaintiff must establish that the complainant's protected activity was the "but-for cause" of the alleged adverse action, i.e., absent the protected activity, the complainant would not have been terminated. *Univ. of Tex. Sw. Med'l Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).[22] The Department of Labor's regulations allow the Secretary to proceed "[i]f protected activity was a substantial reason for the [adverse] action, or if the discharge or other adverse action would not have taken place 'but for' engagement in the protected activity." 29 C.F.R. § 1977.6(b). In this case, the analysis herein is consistent with the "but for" analysis described in *Nassar*.

First, as previously discussed, the reason for Complainant's termination is pretextual. Although Gates was involved in an incident on July 25, he was not disciplined until after J. Mazza knew about the OSHA complaint and knew (or at a minimum, suspected) that the complaint was filed by Gates, the only employee hauling leachate. In addition, despite J. Mazza's alleged instruction to Whitlock on July 25 not to allow Gates on Perry Ridge property, Gates hauled leachate all day on July 26, coming and going from Perry Ridge with Whitlock being fully aware of his presence there. Finally, J. Mazza's repeated assertions that he attempted to call Emling on July 25 (to instruct him to terminate Gates) are entirely disproven by Defendants' own phone records, demonstrating that J. Mazza is, at a minimum, now attempting to "cover his tracks." *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) ("A pretext for discrimination is something worse than a business error – a lie or deceit designed to cover one's tracks.")

Second, Emling did not take any disciplinary action against Gates until after he was instructed to do so by J. Mazza (who knew about the OSHA complaint and that Gates had filed

---

[22] At this time, no court has ruled that this standard applies to Section 11(c) claims under the Act.

18

it). Even if Emling had decided to discipline Gates for his behavior on July 25, he would only have issued a verbal or written warning to Gates. This was consistent with Emling's disciplinary policy. Whitlock also admits that he did not think Gates' behavior on July 25 warranted termination and Whitlock permitted Gates to work at Perry Ridge on July 26, despite the prior day's events. These facts lead to the conclusion that, if Gates had not filed an OSHA complaint on July 26, he would never have been terminated. Absent J. Mazza's interference (again, occurring after J. Mazza knew of the OSHA complaint), there is no evidence that Gates would have been terminated by Emling or Whitlock for the July 25 incident.

Finally, the timing of events demonstrates that Gates would not have been fired but for his protected activity. Although J. Mazza learned of the July 25 incident on the day it occurred, he made no attempts to contact Emling on that date (despite his repeated assertions that he did so). Gates continued to work on July 25 and July 26. Moreover, it was not until the afternoon of July 26, after finding out about the OSHA complaint, that J. Mazza first contacted Emling to terminate Gates. Emling's own statements reflect that even he believed the timing was suspicious.

In light of all of the above, the Secretary has established that, but for Gates' protected activity, Defendants would not have terminated him. Therefore, the Secretary is entitled to judgment as a matter of law.

## **CONCLUSION**

For the foregoing reasons, the Court should GRANT the Secretary's motion for summary judgment because there are no genuine issues of material fact and the Secretary is entitled to judgment as a matter of law. In the alternative, if the Court finds that genuine issues of material fact exist as to some issues, the Court should GRANT partial summary judgment in the

Secretary's favor as to the remaining issues.

                                        Respectfully submitted,

                                        s/ Travis W. Gosselin
                                        **TRAVIS W. GOSSELIN (6282984)**
                                        Trial Attorney
                                        Lead Counsel

                                        U.S. Department of Labor
                                        Office of the Solicitor
                                        8th Floor
                                        230 South Dearborn Street
                                        Chicago, Illinois 60604
                                        (312) 353-6991
                                        (312) 353-5698 (fax)
                                        gosselin.travis@dol.gov

---

## CERTIFICATE OF SERVICE

      I hereby certify that on March 24, 2014, I caused one (1) copy of the foregoing **Secretary's Brief in Support of His Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment** has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

                                Dayna L. Johnson
                                dlj@greensfelder.com

                                Brian P. Cavanaugh
                                bcavanaugh@cavanaugh-law.net

                                                    s/ Travis W. Gosselin
                                                   TRAVIS W. GOSSELIN (6282984)
                                                   Trial Attorney
                                                   Lead Counsel