IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMAS E. PEREZ, Secretary of          )
Labor, U.S. Department of Labor,       )
                                       )
                Plaintiff,             )
                                       )
vs.                                    )          Case No. 13-cv-0337-MJR-DGW
                                       )
PANTHER CITY HAULING, INC.,            )
PERRY RIDGE LANDFILL, INC.,            )
and JOSEPH MAZZA,                      )
                                       )
                Defendants.            )

MEMORANDUM AND ORDER ON
PLAINTIFF'S SUMMARY JUDGMENT MOTION
AND DEFENDANTS' MOTION TO STRIKE

REAGAN, District Judge:

A.      **Introduction and Procedural Overview**

This case arises from the July 2011 firing of Mark Gates, who was employed as a truck driver by Panther City Hauling, Inc.  In April 2013, Seth D. Harris, the Acting Secretary for the United States Department of Labor, filed suit in this Court against three Defendants – (1) Panther City Hauling, Inc., (2) Perry Ridge Landfill, Inc., and (3) Joseph Mazza, Vice President of Perry Ridge at the time relevant to this action. Harris was later replaced by Thomas E. Perez, the current Secretary of Labor.  By operation of law, Perez was automatically substituted in place of Harris as Plaintiff. **Fed. R. Civ. P. 25(d).** The Clerk's Office will adjust the docket sheet accordingly.

Plaintiff alleges that Panther City Hauling, Perry Ridge Landfill, and Joseph Mazza violated Section 11(c) of the Occupational Safety and Health Act of 1970, 29

U.S.C. 651, et seq. (the Act), by discriminating against Gates – i.e., firing Gates based on his exercise of rights under the Act.   More specifically, Plaintiff alleges that Gates filed an OSHA complaint on July 26, 2011, and Defendants retaliated by firing Gates the following day.

The complaint alleges that due to Defendants' actions, Gates lost salary/benefits and suffered emotional pain and damage to his reputation.   Plaintiff seeks compensatory and punitive damages, reinstatement of Gates to his job as a truck driver (or front pay in lieu of reinstatement), expungement of records relating to the termination, the prominent posting of a notice stating that Defendants will not discriminate against employees for engaging in activities protected under § 11(c) of the Act, and an order permanently enjoining Defendants and their officers/agents from violating § 11(c) of the Act.

The Court enjoys subject matter jurisdiction under the federal question statute, 28 U.S.C. 1331, and § 11(c) of the Act, 29 U.S.C. 660(c)(2).   The latter provides (emphasis added):

> Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this subsection may, within thirty days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate. If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person. **In any such action the United States district courts shall have jurisdiction, for cause shown to restrain violations of paragraph (1) of this subsection and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay.**

In January 2014, Plaintiff obtained leave to file an amended complaint which clarified Defendant Mazza's title and management role at Panther City Hauling and Perry Ridge Landfill (Doc. 36).  Defendants answered the amended complaint January 17 through 31, 2014, (Docs. 38-40).  Trial is set to commence September 22, 2014.

Now before the Court are three motions for summary judgment and a motion to strike.  Plaintiff's motion for summary judgment (Doc. 43) ripened with the filing of a reply brief on May 15, 2014.  Defendant Mazza's summary judgment motion (Doc. 47) and Defendant Perry Ridge's summary judgment motion (Doc. 49) ripened with the filing of reply brief on May 16, 2014.  Defendants Mazza and Perry Ridge's joint motion to strike (Doc. 54) ripened with the filing of a response on May 19, 2014.   This Order addresses Plaintiff's motion for summary judgment and Defendants' motion to strike. For the reasons set forth below, the Court will deny both motions (Docs. 43 and 54)

### B.     General Standards Governing Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe,* **743 F.3d 1101, 1105 (7th Cir. 2014),** *citing* **FED. R. CIV. P. 56(a).** *Accord Anderson v. Donahoe,* **699 F.3d 989, 994 (7th Cir. 2012).**  A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC,* **656 F.3d 540, 547 (7th Cir. 2011),** *citing Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 248 (1986).** *Accord Bunn v. Khoury Enterpr., Inc.,* **-- F.3d --, 2014 WL 2198557 (7th Cir. May 28, 2014).**

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party.  *Anderson,* **699 F.3d at 994;** *Righi v. SMC Corp.,* **632 F.3d 404, 408 (7th Cir. 2011);** *Delapaz v. Richardson,* **634 F.3d 895, 899 (7th Cir. 2011).**   When cross-motions for summary judgment are filed, "we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America,* **499 F.3d 640, 643 (7th Cir. 2007).**   In other words, the "fact that both parties moved for summary judgment does not change the standard of review." *Estate of Davis v. Wells Fargo Bank,* **633 F.3d 529, 539 (7th Cir. 2011).**

As the United States Court of Appeals for the Seventh Circuit has explained, on cross-motions for summary judgment, the Court must construe "the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Durable Mfg. Co. v. U.S. Department of Labor,* **578 F.3d 497, 501 (7th Cir. 2009),** *citing Rickher v. Home Depot., Inc.,* **535 F.3d 661, 664 (7th Cir. 2008).** *Accord Jefferson v. United States,* **546 F.3d 477, 480 (7th Cir. 2008).**

An additional word regarding the burden of proof is warranted here.  Rule 56 imposes an initial burden of production on the movant for summary judgment – he must demonstrate that a trial is not needed.  *Celotex Corp. v. Catrett,* **477 U.S. 317, 323 (1986).**   The Seventh Circuit has clarified that the parties' burdens on summary judgment depend on whether the movant does or does not bear the ultimate burden of persuasion at trial.

> Where the nonmovant bears the ultimate burden of persuasion on a particular issue, … the requirements that Rule 56 imposes on the moving party are not onerous.  It does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id. (emphasis in original)*.  Rather, the movant's initial burden "may be discharged by 'showing' – that is point[ing] out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.   The nonmovant need not depose her own witnesses or produce evidence in a form that would be admissible at trial, but she must "go beyond the pleadings" … to demonstrate that there is evidence "upon which a reasonable jury could properly proceed to find a verdict" in her favor."

*Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).  *See also Marcatante v. City of Chicago*,  657 F.3d 433, 439 (7th Cir. 2011); *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 648–49 (7th Cir. 2011), *citing Celotex*, 477 U.S. at 323.

Here though, *Plaintiff* has filed a motion for summary judgment.  As to that motion, the movant for summary judgment *bears* the burden of persuasion at trial.  When the party moving for summary judgment also bears the burden of persuasion at trial, that party's initial summary judgment burden is higher.

When a summary judgment movant bears the burden of persuasion at trial (e.g., the movant is the plaintiff, or the movant is a defendant asserting an affirmative defense), he must establish all the essential elements of his claim or defense.   *See Celotex*, 477 U.S. at 322.  *See also Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) (if summary judgment movant is plaintiff, she must show that the record contains evidence satisfying her burden of persuasion); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (at summary judgment stage, party that bears burden of

persuasion at trial must come forward with sufficient evidence of each essential element of its prima facie case); Moore's Federal Practice § 56.13(1) (3d ed. 2000).

To summarize, if the summary judgment movant does *not* bear the burden of proof at trial, he can prevail just by showing an absence of evidence to support <u>any</u> essential element of the nonmovant's case.  But if the summary judgment movant *does* bear the burden of proof at trial, he can prevail only by proving <u>each</u> element of his case with evidence sufficiently compelling that no reasonable jury could return a verdict for the nonmovant. *Celotex*, **477 U.S. at 331 ("If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial").**  *See also Anderson,* **477 U.S. at 248.**  As to Plaintiff's motion, this case fits in the latter category.

Bearing those procedural standards in mind, the Court assesses the record before it.  But one preliminary matter must be addressed – which materials tendered in support of Plaintiff's motion may properly be considered by the Court.

### C.   <u>Analysis of Perry Ridge/Mazza Motion to Strike (Doc. 54)</u>

Defendants Perry Ridge and Mazza move to strike certain exhibits submitted in support of Plaintiff's summary judgment motion.  Rule 12(f) authorizes a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  *Delta Consulting Group, Inc. v. R. Randle Const., Inc.,* **554 F.3d 1133, 1142 (7th Cir. 2009),** *quoting* Fed. R. Civ. P. 12(f).  Motions to strike generally are disfavored due to their potential for delay and the fact they are not appropriate for resolving issues that turn on facts yet to be developed, but they are

properly used to "remove unnecessary clutter" from the pleadings. *See Williams v. Jader Fuel Co., Inc.,* **944 F.2d 1388, 1400 (7th Cir. 1991),** *cert. denied,* **504 U.S. 957 (1992); Heller Financial, Inc., v. Midwhey Powder Co., Inc.,** **883 F.2d 1286, 1294 (7th Cir. 1989); U.S. v. 416.81 Acres of Land,** **514 F.2d 627, 631 (7th Cir. 1975);** *Atkins v. Pickard,* **298 Fed. Appx. 512, 513, 2008 WL 4832924 (7th Cir. 2008).**

Federal district courts enjoy considerable discretion to strike scandalous material and allegations which bear "no possible relation to the controversy or may cause the objecting party prejudice." *Talbot v. Robert Matthews Distributing Co.,* **961 F.2d 654, 664-65 (7th Cir. 1992).** And district courts have discretion to strike affidavits or similar materials submitted with a summary judgment motion if (for instance) they contain hearsay, they are not signed/dated, or they are not based on personal knowledge. *See, e.g., Estate of Davis,* **633 F.3d at 540;** *Marshall v. Local 701 Intern. Brotherhood of Electrical Workers,* **387 Fed. Appx. 623, 626-27 (7th Cir. 2010),** *citing* FED. R. CIV. P. **56(e)(1) and** *Magyar v. Saint Joseph Reg'l Medical Center,* **544 F.3d 766, 770 (7th Cir. 2008).** The motion to strike pending herein asks the undersigned to strike materials filed with Plaintiff's summary judgment motion as violative of rules of civil procedure and evidence.

The Federal Rules of Civil Procedure governing summary judgment were revised and reorganized in 2010. Rule 56(c)(4) no longer requires a formal affidavit to be submitted, *Jajeh v. County of Cook,* **678 F.3d 560, 567-68 (7th Cir. 2012),** but it does require that any affidavit or declaration offered in support of summary judgment "be made on personal knowledge, [and] set out facts that would be admissible in evidence."

**Fed. R. Civ. P. 56(c)(4).** *See also Johnson v. Holder,* **700 F.3d 979, 982 (7ᵗʰ Cir. 2012)
(noting that** *Luster v. Illinois Dept. of Corrections,* **652 F.3d 726 (7ᵗʰ Cir. 2011), held
that evidence offered to support or oppose summary judgment must be admissible at
trial, and affidavits or declarations must be made with personal knowledge);** *Olson,*
**750 F.3d at 714 (Rule 54(c) allows parties to oppose – or support – summary judgment
with materials that themselves would be inadmissible at trial as long as the** *facts*
**could later be presented in admissible form).**

Perry Ridge and Mazza challenge various exhibits tendered in support of
Plaintiff's summary judgment motion.  They ask the Court to strike Exhibit D (the
Declaration of Sean Mullins) and Exhibit P (the Declaration of Frank Fuchs), on the
ground that the declarations "fail to recite that the declarants, if called to testify, could
testify competently to the matter asserted therein" and that they contain "inadmissible
hearsay" (Doc. 54, p. 1).

Mullins is an investigator for OSHA assigned to the Peoria, Illinois office.
Mullins discloses what he learned during his investigation of Gates' OSHA complaint,
from conversations with Tom Emling (President of Panther City Hauling), Joseph
Mazza (Vice President of Perry Ridge Landfill), and Mike Whitlock (General Manager
of Perry Ridge Landfill) about Gates' termination.

Fuchs is the OSHA compliance officer in Fairview Heights, Illinois who received
Gates' complaint about no fall protection system in place at Perry Ridge Landfill.  Fuchs
supplies a timeline for when OSHA received Gates' complaint, when Fuchs left a
message for Perry Ridge, when Whitlock (at Perry Ridge) returned the call, when Fuchs

called Panther City Hauling, and when Fuchs sent a letter to Panther City notifying them that an OSHA complaint had been filed.

The Fuchs and Mullins declarations were submitted under penalty of perjury and attest that the information contained therein is true and correct to the best of the declarants' information and belief.  Both declarations are dated and signed.  Rule 56(c)(4) says that a declaration used to support summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and *show* (not state) that the declarant is competent to testify on the matters stated.

The Fuchs and Mullins declarations were made on personal knowledge and plainly show that the declarants are competent to testify on the matters set forth.  The declarations do not warrant striking just because they fail to specifically recite that declarants are competent to testify to the matters contained therein.

The Court also concludes that the declarations – for the most part – set out facts that would be admissible in evidence.  Many of the challenged statements contained in the declarations are admissions by a party or its agent and thus non-hearsay.  For example, the statements made by Joseph Mazza (a named Defendant herein) are either party admissions falling within Rule 801(d)(2)[1] or are not offered for the truth asserted therein (thus not hearsay at all).

---

[1]       Federal Rule of Evidence 801(d)(2) provides that a statement is *not* hearsay if it is offered against an opposing party, was made by that party in an individual or representative capacity, or was made by the party agent or employee on a matter within the scope of that relationship and while it existed.  Mazza is a named Defendant (an opposing party to Plaintiff); Emling is an agent of Panther City (an opposing party); and Whitlock is an agent or employee of Perry Ridge (an opposing party).

Page **9** of 24

Defendants move the Court to strike Exhibits E, F, G, H, K, L, M, N, O, and Q on dual grounds – first, that Plaintiff failed to establish a foundation for the admission for these exhibits into evidence, and second, that the records "are of no assistance" in determining "the only matter before this Court – the alleged discriminatory termination of Mark Gates" (Doc. 54, p. 2).  The Court finds these arguments unavailing.

As to the latter ground, Defendants define relevance far too narrowly.  As to the former ground, Defendants maintain that Plaintiff has not produced the testimony of a qualified witness that these records were kept in the course or regularly conducted business activity and that it was the regular practice of the business to make such records.  The business records exception is one way to admit the challenged exhibits; it is not the exclusive method.  Plaintiff points out that Exhibits E, F, G, and H (contracts and similar legal documents) are admissible as verbal acts.  Statements that constitute verbal acts – like words of contract -- are not hearsay, because they are not offered for their truth.  *See, e.g., Schindler v. Seiler*, **474 F.3d 1008, 1010-11 (7th Cir. 2007); FED. R. EVID. 801(c) Advisory Committee Notes (Rule 801(c) excludes from the definition of hearsay "'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.").** And Exhibit O (a uniform hazardous waste manifest signed by Whitlock on July 26, 2011) is not hearsay, because it is not offered to prove the truth of the matter asserted therein (i.e., that Whitlock authorized Gates to haul leachate) but rather is offered to show that Gates was present at Perry Ridge on July 26, 2011.

Similarly, the Court finds unconvincing Perry Ridge/Mazza's argument that Exhibits K, L, M, N and Q – telephone records from Verizon and AireSpring for Emling, Whitlock, Mazza and Perry Ridge – are inadmissible for lack of foundation.   To authenticate an item of evidence, the proponent must show that the item is what the proponent claims it is.   **FED. R. EVID. 901(a).**   Perry Ridge and Mazza produced these records to Plaintiff in response to discovery requests.   It rings hollow for Perry Ridge and Mazza to now claim the records lack foundation or have not been properly authenticated.   *See, e.g., United States v. Brown,* **688 F.2d 1112, 1116 (7th Cir. 1982);** *United States v. Turner,* **718 F.3d 226, 232 (3rd Cir. 2013)(included in list of appropriate methods of authentication, documents produced in response to a discovery request).** Produced by Defendants in discovery, the telephone records contain date and time information probative on the issue of who may have known what when, which in turn bears on the issue of whether the person(s) deciding to terminate Gates' employment knew that Gates had filed an OSHA complaint.

Finally, several of the exhibits covered by Defendants' motion to strike fall within the residual hearsay exception found in Federal Rule of Evidence 807.   That exception allows admission of an out-of-court statement not covered by Rules 803 or 804 if the district court finds that the statement "has equivalent circumstantial guarantees of trustworthiness," is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts, and "admitting it will best serve the purposes of these rules and the interest of justice."   **FED. R. EVID. 807(a).**

Simply put, the Court is not persuaded that Plaintiff's supporting materials should be stricken.  For all these reasons, the Court **DENIES** Perry Ridge and Mazza's April 28, 2014 motion to strike (Doc. 54).  Applying the above-delineated procedural standards as to Plaintiff's summary judgment motion, the Court now reviews the key facts and allegations.

### D.   Analysis of Plaintiff's Summary Judgment Motion (Doc. 43)

**(1)   SUMMARY OF EVIDENCE[2]**

**Perry Ridge** is an independently owned and operated landfill in Southern Illinois, within this Judicial District.  At the times relevant to this lawsuit, Perry Ridge had twelve to fifteen employees, ten of whom worked at the landfill.  Perry Ridge's officers at that time included, inter alia, **Joseph Mazza** (Vice President) and **Tom Emling** (Area Manager).

**Panther City Hauling** was formed in December 2008.  In November 2009, Tom Emling purchased Panther City Hauling.  Eighteen to twenty-four months later, Panther City contracted to perform hauling services using Perry Ridge Landfill's trucks.  Under this arrangement, Perry Ridge supplied the trucks, while Panther City supplied the driver (and fuel) and made repairs on the trucks.  Panther City billed Perry Ridge by the ton for rock and sand (and by the load for dirt and demolition material) hauled.  Panther City gave Perry Ridge a discount, because Panther City used Perry Ridge's trucks in the hauling business.

---

[2]     These facts are derived from deposition testimony, exhibits, affidavits, and other materials submitted with the parties' summary judgment motions.  *See, e.g.,* Gates' Deposition, Exhibit I, Doc. 44-10.   On Plaintiff's motion, the Court views the facts and reasonable inferences in the light most favorable to Defendants.

On November 4, 2010, Panther City hired **Mark Gates** as a truck driver.  Gates was hired by Tom Emling, president and sole shareholder of Panther City.  Panther City paid Gates $14.50 per hour, plus overtime.  It was expected that Gates would spend a good deal of time going to and from Perry Ridge.  Gates' job involved hauling rock, sand, and sawdust *to* Perry Ridge (the landfill), and then hauling landfill fluid (called "leachate") *from* Perry Ridge to the DuQuoin, Illinois municipal water treatment facility.

Usually, Gates clocked in at Panther City around 7:00 a.m.  Gates received work instructions from Emling (at Panther City) and also from Mike Whitlock (operations manager at Perry Ridge Landfill).  Whitlock was in charge of day-to-day operations at the landfill and ensured that the landfill complied with applicable regulations.  Unless instructed otherwise by Emling, Gates would clock in at Panther City, go to Perry Ridge, and be dispatched from there by Whitlock, i.e., Whitlock would tell Gates what rock to pick up at the quarry or what sawdust needed to be hauled, etc.

If leachate needed to be disposed of from Perry Ridge, Gates would drive to Perry Ridge, transfer the leachate from Perry Ridge's tanks into the trailer of his truck, drive the leachate to the water treatment facility, and return with the empty trailer to Perry Ridge.  All equipment used for this process was owned by Perry Ridge Landfill, including the tanks, truck, trailer, and hose.  In July 2011, Gates was the only employee who hauled leachate from Perry Ridge Landfill.

The job of transferring the leachate from the landfill tanks to the trailer on the truck required Gates to climb a ladder and connect a hose from the leachate tanks to the trailer.  Three or four times, Gates complained to Whitlock about the lack of fall

protection when working atop the trailer.  During the leachate transfer process, the trailer could become slick or slippery from the overflow of leachate.  At least twice, Gates came close to falling from the trailer while doing the transfer.

The first time Gates complained, Whitlock provided a safety harness.  But Gates wanted an overhead tie-off to which he could hook the safety harness.  Whitlock told Gates to just hook the harness to the ladder.  Gates believed the harness hooked to the ladder was not sufficient fall protection.  Gates took these concerns directly to Mike Whitlock (Gates Depo., pp. 424-428; Doc. 44-10, pp. 25-29):

> A.      After he give me the harness, I asked him what I was supposed to do with it.  And he said, hook it to the ladder.  And I said, you need a tie-off, Mike.  The ladder is below me.  If it's attached to the ladder, I can still fall and still hit the ground.
> ….
> A.      The ladder on the tank only went up approximately … 9 to 10 feet. There was a platform there.  And you had to step up on that platform to step up on the catwalk on top of the [leachate] tank to reach the manhole to open the lid.
>
> So … I had to stand on top of the tank, take the hose, open the manhole with one hand, pull the hose with the other hand, stick the hose in, shut the lid over it.  Then I could climb back down.
>
> Q.      So if you had the harness on attached to the ladder and you fell, what would happen?
>
> A.      I would hit the ground.  The harness, the way the tether -- the tether is the part in the back of the harness that's hooked in the shoulder blades.   It, in itself, is 2 to 3 foot, and it's on a retractable -- it works like a seat belt.  So it goes out so far and then it locks.  That, combined with how far it comes out when it locks, plus me being 6 foot, I'm going to hit the ground.  I'm only 9 foot in the air on the ladder.  The last rung that I could hook it to was only about 9 foot in the air.

When Gates subsequently complained to Whitlock, Whitlock explained that the company did not have time or money to install an overhead tie-off (Gates Depo., p. 431; Doc. 44-10, p. 29).   Gates eventually shared his concern about fall protection with Emling.  Emling and Gates checked into OSHA regulations.  Emling deferred to Perry Ridge's solution of furnishing the safety harness.   Because he did not believe the harness was effective without a tie-off, Gates did not wear the harness.

Around 6:00 a.m. on Thursday, July 21, 2011,[3] Gates drove a scooter to his job. The scooter hit a pothole, developed a fuel line leak, and broke down en route to work (in front of the gate).  Gates put the scooter in a service truck and drove *to Perry Ridge* to repair the scooter.  He pulled in and talked to Mike Whitlock.  Whitlock said Gates could use whatever tools or gas he needed to repair the scooter.  Gates fixed the scooter at Perry Ridge Landfill, using gas from a gas can near the wastewater tank.  He estimated this to be a 5-gallon gas can.  He used some but not all of the gas in the can. Gates then left, reported to work at Panther City, and went about his normal work day. He concluded his day at Panther City, clocking out at the end of his shift.

The next day -- Friday, July 22, 2011 – Gates was to haul leachate.  To do this, he needed to fill the leachate truck with gas at Perry Ridge.  In the process, Gates saw that someone had written "No Scooters" on the gas can.  This angered Gates, who felt that

---

[3]      The depositions and pleadings reflect initial confusion as to the dates of the events leading up to Gates' termination from employment.   Gates testified in his deposition to things happening on the Thursday and Friday in July just prior to this termination.   Panther City admits in its answer to the amended complaint (and the documents indicate) that Gates was fired on July 27, 2011 (a Wednesday).  This confusion was later corrected in the deposition.   The actual dates in question would have been Thursday, July 21, 2001; Friday, July 22, 2011; Monday July 25, 2011; Tuesday July 26, 2011; and Wednesday July 27, 2011.

the Perry Ridge mechanics were making fun of him for being a 300-pound man who had to ride a scooter.  Gates was "pissed off" and stewed about this all weekend (Gates' Depo., p. 74).

On Monday, July 25, 2011, Gates went into the Perry Ridge Landfill shop at roughly 7:30 a.m.  Gates wanted to ask Mike Whitlock (the supervisor at Perry Ridge) and Joel Capps and Kevin Greenwood (Perry Ridge employees) if they had written "No Scooters" on the gas can.

Greenwood and Capps were sitting in chairs in the shop.  Capps admitted that he was the one who had written on the gas can.  A confrontation ensued, and the tension escalated.  Gates threatened to "whoop his ass" if Capps did something like that again (Gates Depo. p. 103).  Capps repeatedly apologized, without success.  Gates (who remained standing) was loud, blunt, cursing, and repeatedly yelling at Capps while towering over him.  This lasted four to ten minutes.  In his deposition, when asked if he threatened Capps, Gates testified (Gates Depo. p. 105):

> A.    It wasn't a threat.   It was a promise.  If he done it again, I was going to whoop his ass.  I mean, I can't be more clear than that, do you know what I mean?

Tom Emling was at the landfill that morning and had followed Gates into the Perry Ridge shop.  Mike Whitlock had been walking through the shop on the way to his office when the confrontation began.  Whitlock interjected.  Whitlock walked up to Gates, got close to him and said he had let Gates speak, and now it was time for Gates to leave Whitlock's shop.  Gates responded that Whitlock wasn't his (Gates') boss (Gates Depo. pp. 98-100):

A.      He said for me to leave the shop.  I said, Mike, get out of my face, I don't work for you, I work for this man right here.  I pointed to Tom Emling.  Tom turned to Mike and said, Mike go get the paperwork so he [Gates] can do his job.

As Whitlock walked away, Gates said to Emling (his boss), "I'm tired of fucking stupid people" (Gates Depo. pp. 394-395).  Gates did not apologize to anyone for the altercation.  Gates left the shop to haul leachate.

Around 9:25 am the same day (Monday, July 25, 2011), Whitlock called Joseph Mazza on the telephone and told Mazza about Gates' threatening behavior to Capps.  According to Mazza, (1) Mazza instructed Whitlock to forbid Gates from coming back on Perry Ridge property, and (2) Mazza told Whitlock that Gates should be fired.

Gates returned to work as scheduled early the next morning (Tuesday, July 26, 2011).  Whitlock signed a Uniform Hazardous Waste manifest on July 26, 2011 (Doc. 44-16, p. 2), which also was signed by Gates that day, suggesting Whitlock was aware that Gates was on Perry Ridge property.

Joseph Mazza called Tom Emling twice on July 26th.  Mazza told Emling to fire Gates.  Emling and Mazza both testified that the only reason Mazza gave Emling when telling him to fire Gates was that Gates had threatened Perry Ridge employees (i.e., the Capps incident in the Perry Ridge shop).

That same day (Tuesday, July 26, 2011), Gates contacted OSHA about filing a complaint regarding the lack of fall protection on the Perry Ridge leachate tank.  Gates spoke to OSHA compliance officer Frank Fuchs.  Gates said he had slipped atop the trailer while transferring leachate that morning.  An hour later, Fuchs called Perry

Ridge Landfill and Panther City Hauling and left voicemail messages asking someone to return the call.  Fuchs did not hear back that day from anyone at Panther City,[4] but he did get a call from Mike Whitlock at Perry Ridge Landfill (on July 26, 2011).  Fuchs told Whitlock that an OSHA complaint had been filed about fall protection equipment.  Whitlock commented that he thought he knew who had filed the complaint and noted that this employee had been given a safety harness (Fuchs Decl., Doc. 44-17).

Tom Emling, who was present at the July 25 incident in the Perry Ridge shop and who had been instructed by Mazza to fire Gates on July 26,  prepared a termination memo for Gates on July 26th.  Emling was unable to terminate Gates that day, because Gates had already clocked out.   Gates was fired the following morning -- on Wednesday, July 27, 2011.

On July 27th, Emling called Gates into his office, a meeting witnessed by Kevin Lipe.  Emling read Gates the termination memo, which states:  "Because of verbal threats of bodily harm to landfill employees that were witnessed by several individuals at Perry Ridge Landfill on July 25, 2011, we are terminating your employment effective immediately as of July 27, 2011."  Emling signed the memo in front of Gates.

About two minutes after being told he was fired, Gates responded that he was not surprised he was being fired, since he had filed an OSHA complaint.  Emling testified that this was the first he learned of the OSHA complaint.  Emling said that he

---

[4]        The next day, on July 27, 2011, Fuchs sent a letter to Panther City Hauling informing Panther City that an OSHA complaint had been filed.

fired Mark Gates, because Joseph Mazza told him to do so based on the July 25 confrontation/incident at Perry Ridge.

(2)   **ANALYSIS**

The Occupational Safety and Health Act was enacted to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." **29 U.S.C. 651(b).**  29 U.S.C. 660(c) – referred to herein as § 11(c) -- is the Act's retaliatory discharge provision.  It prohibits discrimination by an employer against an employee who reports a violation of OSHA.  *See, e.g., Himmel v. Ford Motor Co.,* **342 F.3d 593, 606 (6th Cir. 2003),** *citing* **29 U.S.C. 660(c) (The Occupational Safety and Health Act "explicitly prohibits employer discrimination against employees who report violations.").**

The United States Court of Appeals for the Seventh Circuit applies a "but for" test in assessing the alleged adverse action against the employee.  In *Gaffney v. Riverboat Services of Indiana, Inc.,* **451 F.3d 424, 453 (7th Cir. 2006),** *cert. denied,* **549 U.S. 1111 (2007),** the Seventh Circuit explained (emphasis added):

> Under OSHA, in order for a plaintiff to establish that he was terminated in retaliation for filing a health or safety complaint, he must show that the "protected activity was a substantial reason for the action," although it "need not be the sole consideration behind discharge." 29 C.F.R. § 1977.6(b).  In such circumstances, as under § 2114, **the ultimate question is whether the discharge or other adverse action would have "taken place 'but for' engagement in protected activity."** *Id.; see also Dole v. H.M.S. Direct Mail Serv., Inc.,* 752 F.Supp. 573, 580 (W.D.N.Y.1990) (holding that, although the plaintiff was a "problem employee" and eventually may have been terminated for that reason, the immediate cause of his termination was the OSHA report); *Donovan v. Commercial Sewing, Inc.,* 562 F.Supp. 548, 552–53 (D.Conn.1982) (concluding that the OSHA complaint was the but-for cause of the plaintiff's termination, given the

temporal connection between that complaint and the subsequent termination).

So, in the case at bar, the ultimate question is whether Gates would have been fired "but for" engaging in the protected activity, i.e., filing the OSHA complaint.[5]

There are two recognized methods by which a plaintiff can present a retaliation claim (in cases based on federal, as opposed to state law).  Under the so-called "direct method" (invoked by Plaintiff here; Doc. 44, p. 10), the plaintiff must prove: (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.  *See, e.g., Hobgood v. Illinois Gaming Board,* **731 F.3d 635, 642 (7th Cir. 2013) (assessing retaliation claims under Title VII and First Amendment);** *Harper v. C.R. England, Inc.,* **687 F.3d 297, 307 (7th Cir. 2012) (assessing Title VII retaliation claim).**

Circumstantial evidence may be used to establish the causal connection, for instance, a showing that the adverse employment action so closely followed the protected activity that it gives rise to an inference of retaliatory motive.  *Reich v. Hoy Shoe Co., Inc.,* **32 F.3d 361, 365 n.4 (8th Cir. 1994).  *See also Tate v. Ancell,* 551 Fed. Appx. 877, 887 (7th Cir. 2014) (direct method of proving retaliation can involve either "smoking gun" type direct evidence or circumstantial evidence which rests on a longer chain of inferences).**

---

[5]     Plaintiff's Amended Complaint (Doc. 36, p. 3) describes Gates' protected activity as "filing a verbal complaint" with OSHA between 7:30 and 8:00 a.m. on July 26, 2011

Some cases have found that a causal relationship is *disproven* if the employer was not aware of (did not know of) the employee's statutorily protected activity.  ***See Reich, 32 F.3d at 366,*** *citing* ***Wolff v. Berkley, Inc.,*** **938 F.2d 100, 103 (8ᵗʰ Cir. 1991)[6]; *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 668 (7ᵗʰ Cir. 2006) (Title VII retaliation claim, presented under the direct method, failed because employer did not have knowledge of the employee's protected activity).**   In seeking summary judgment here (*see* Doc. 44, pp. 10-11), Plaintiff includes the employer's knowledge as one of <u>four</u> elements that must be proven to establish retaliation under § 11(c) of the Act:  (1) the complainant engaged in protected activity, (2) Defendants *had knowledge* of that protected activity, (3) the complainant suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action.

Rather than treating knowledge as a separate fourth element of the plaintiff's cause of action for retaliation, it is possible to view knowledge as part and parcel of the causal connection assessment (what the employer knew can buttress or undermine the existence of a link between the employee's protected activity and the adverse employment action).  Approached either way, the evidence of causal connection falls short of warranting summary judgment for Plaintiff here.

---

[6]     A plaintiff can establish the causal connection by presenting evidence sufficient to show that "a particular employee engaged in protected activity, in the form of lodging an OSHA complaint; that the employer was aware that some employee had filed or made such a complaint; that the employer suspected that employee of having made the complaint; and that the employer took retaliatory action based on its suspicion." ***Reich, 32 F.3d at 367.***

Plaintiff has demonstrated that complainant Gates engaged in protected activity and suffered an adverse employment action.  But construing the facts and reasonable inferences in the light most favorable to the nonmovants, the Court concludes that seriously disputed genuine issues of material fact remain as to the causal connection between Gates' activity and his firing.  Specifically, genuine issues of material fact exist regarding the reason Gates was fired – e.g., what was Emling's motivation for firing Gates and what did Emling know when fired Gates.

Panther City was Gates' employer.  Tom Emling (president and sole shareholder of Panther City) hired Gates.  Tom Emling fired Gates.  As to the *reason* for Gates being fired, some evidence indicates that Emling typically would not have fired an employee for an outburst such as Gates' gas can incident without first issuing a written warning.  Other evidence indicates that Gates' July 25th angry outburst *directly* resulted in the decision to fire Gates, and the termination process was put in motion *before* Gates' made his oral OSHA complaint on July 26th.  Indeed, a reasonable inference can be drawn from the evidence that Gates lodged the OSHA complaint because he suspected he was in serious trouble for his threatening behavior at the Perry Ridge shop.

As to who knew what when, the record contains conflicting evidence.  Plaintiff has presented evidence of clearly suspicious timing – a close temporal proximity between Gates' protected activity and his termination (one followed right on the heels of the other).  But other evidence plainly counters the inference of retaliatory motive.  Mazza and Emling testified that they only learned about Gates' July 26 OHSA complaint *after* they decided that Gates should be fired.  Mazza learned about the

OSHA complaint from Whitlock *after* Mazza instructed Emling to fire Gates.  And Emling says he did not learn about the OSHA complaint until he was told about it by Gates after Emling fired him.  If Mazza and Emling did not know of the OSHA complaint until after they decided to fire Gates (Mazza) or after they actually fired him (Emling), the protected activity could not have been the reason for the termination.

As noted above, in this Circuit, retaliation claims require but-for causation. **Gaffney, 451 F.3d at 453 (the ultimate question is whether the discharge would have occurred but for the employee engaging in protected activity).  *See also Cung Hnin v. TOA (USA), LLC,* -- F.3d --, 2014 WL 1758457 (7th Cir. May 5, 2014) (addressing retaliation claims under Title VII, which "require traditional but-for causation, not a lesser 'motivating factor' standard of causation"); *Chaib v. Indiana,* 744 F.3d 974, 987 (7th Cir. 2014) (Title VII retaliation claim requires proof that unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer).**

In the case at bar, Panther City flatly denies (and has identified evidence to refute the assertion) that Mark Gates' firing was motivated by his July 26, 2011 OSHA complaint.  Stated another way, viewing the facts and reasonable inferences in the light most favorable to Defendants, the record does *not* permit the finding that Mark Gates would not have been fired absent his protected activity.  Plaintiff's motion for summary judgment must be denied.

F.    **Conclusion**

On summary judgment, the judge's role is not to weigh conflicting evidence and resolve credibility issues.   Instead, the judge must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson,* **477 U.S. at 249, 251-52.**  In the case sub judice, a reasonable jury could credit Defendants' evidence as to motive/knowledge and find no causal link between Gates' protected activity and his firing.  A reasonable jury could find in Defendants' favor.  Genuine issues of material fact preclude the existence of summary judgment in favor of Plaintiff.

Accordingly, the Court **DENIES** Plaintiff's March 24, 2014 motion for summary judgment (Doc. 43).   The motion alternatively sought *partial* summary judgment on any issue "for which there is no genuine dispute" (Doc. 43, p. 2).  The Court is not entering summary judgment or partial summary judgment, but the Court has found herein that complainant Gates (1) engaged in protected activity, and (2) suffered an adverse employment action.  That finding carries over to future orders and proceedings herein.

IT IS SO ORDERED.

DATED June 25, 2014.

s/ *Michael J. Reagan*
Michael J. Reagan
United States District Judge